**BRANCH METAL PROCESSING, INC., Branch Processing, Inc., Branch Trading Company, Inc., and Sam–Man Realty Corp.**

v.

**BOSTON EDISON COMPANY, James G. Grant Co., Inc., Bull HN Information Systems, Inc., Joseph Freedman Company, Inc., R.S.T. Reclaiming Co., Inc., Gemini Trading Corporation, Shetucket Iron and Metal Company, Inc., and Prouvost USA, Inc.**

Civil Action No. 93–444ML.

United States District Court,
D. Rhode Island.

Dec. 5, 1996.

Renee S. Menard, Robert Clark Corrente, Providence, RI, for Branch Metal Processing, Inc., Branch Processing, Inc., Branch Trading Company, Inc.

John J. Bevilacqua, Robert Clark Corrente, Providence, RI, for Sam–Man Realty Corp.

Brooks R. Magratten, Providence, RI, Francis J. Sally, Paul M. McDermott, Boston, MA, Jonathan W. Fitch, Andrea Peraner–Sweet, Providence, RI, for Boston Edison Company.

Mark O. Denehy, Providence, RI, Richard F. Kerr, Braintree, MA, for James G. Grant Co., Inc.

James H. Reilly, III, Providence, RI, for Bull HN Information Systems, Inc.

Dennis T. Grieco, II, Providence, RI, for R.S.T. Reclaiming Co., Inc.

Richard A. Sherman, Providence, RI, Steven M. Richard, Peter J. McGinn, Providence, RI, for Shetucket Iron & Metal Company, Inc.

**902**

## MEMORANDUM AND ORDER

LISI, District Judge.

This matter is before the court on the objections of defendant Boston Edison Company ("Boston Edison") to two Reports and Recommendations issued by United States Magistrate Judge Timothy M. Boudewyns. In those Reports and Recommendations, dated January 6, 1995 and April 25, 1996, Magistrate Judge Boudewyns recommended that this court deny Boston Edison's various motions for summary judgment. For the reasons stated below, this court adopts Magistrate Judge Boudewyns's recommendations.

## I. BACKGROUND

### A. *Facts*

Boston Edison, a Massachusetts corporation, is an electric utility serving residential, municipal, commercial, and industrial customers in eastern Massachusetts. Boston Edison services forty cities and towns covering a 600 square mile area, and generates power at plants located in Everett, South Boston, and Plymouth, Massachusetts. In addition, Boston Edison owns a number of facilities that are used in the construction, maintenance, and repair of its system, the largest of which is the Boston Service Center in Dorchester, Massachusetts.

Electricity moves around the Boston Edison system over cable and line wire. "Cable" is buried underground or laid within underground tunnel systems accessed through manholes. "Line wire" is strung from utility poles and other above-ground structures. Boston Edison estimates that its cable and line wire covers approximately 3,900 miles of Massachusetts streets and roads, and requires constant maintenance and repair.

The cable and line wire used by Boston Edison is routinely removed from service for any of a variety of reasons. Once removed, the cable and line wire is of no use to Boston Edison in the provision of its services; however, it does have value on the metals markets. For this reason, it has long been Boston Edison's practice to gather its "scrap" cable and line wire and sell it, along with other metals and metal items, such as streetlights, to scrap metal vendors.

On or about March 24, 1987, Boston Edison, through its Purchasing and Stores and Services Departments, prepared a Request for Quotation ("RFQ") to be sent to selected scrap metal vendors. The RFQ, # 51415, amounted to a solicitation of bids for a contract for the "sale/disposal of all scrap metals" from its various facilities in the Greater Boston area. RFQ # 51415, at 1. The RFQ contained specifications describing the scope of work, pricing, and pick-up procedures, as well as a form price sheet. The agreement further provided that its term would be two years, "with an option to extend for a third year from date of notification to the successful bidder." *Id.*

The James G. Grant Co., Inc. ("Grant") is a Massachusetts corporation whose principal place of business is located in Readville, Massachusetts. Grant has no offices or facilities in Rhode Island. Grant's business includes demolition contracting, scrap processing, heavy equipment rental, rigging, and the removal and replacement of large fuel storage tanks.

Grant responded to RFQ # 51415 and was eventually awarded the contract by Boston Edison. Grant began to purchase Boston Edison's scrap, which included streetlights that had been removed from service, on or about August 17, 1987. Boston Edison never placed any restrictions on the destination of the scrap, including the streetlights.

In August 1989, Boston Edison began the RFQ process anew and tendered RFQ # 51730 for consideration to various scrap metal dealers, including Grant. Boston Edison included an addendum ("Addendum I") to this RFQ which subjected the scrap metal dealer to whom the RFQ was awarded to abide by, *inter alia*, three provisions. First, the scrap metal dealer was required to obtain all necessary permits and licenses, and to conform to all applicable federal and state laws, with respect to its handling, use, transportation, storage, and disposal of the scrap. Second, Boston Edison reserved the right to inspect the dealer's premises and operation to "verify the existence of applicable permits or licenses required in connection with the handling, use, transportation, storage and

disposal" of the scrap. Addendum I, at ¶ 9. Third, the scrap dealers were required to obtain "environmental impairment liability insurance," *see id.* at ¶ 6, and to indemnify Boston Edison for "any and all loss, damage or liability [Boston Edison] may suffer as a result of the Purchaser's handling, use, transportation, storage and disposal" of the scrap, *see id.* at ¶ 5. These provisions were not incorporated in RFQ # 51415, although they have been included in all RFQs tendered subsequent to RFQ # 51730.

In 1990, Rick Gosselin, an employee authorized to purchase scrap metals for both the Branch Trading Company, Inc. ("Branch Trading") and Branch Processing, Inc., visited Grant's facilities and inquired of Charles Jamieson, an employee of Grant, as to the possibility of purchasing scrap metal, including streetlights, from Grant. The parties reached two agreements, and on January 31, 1990 and April 6, 1990, two loads of streetlights from Grant's scrap yard were delivered to a facility leased by the Branch Companies for their operations ("Branch site"). These loads weighed 17,100 and 18,700 pounds, respectively.

The streetlights, which were purchased for their aluminum content, were allegedly placed into a large, outdoor shredding system at the Branch site. The shredding system purportedly condensed the metal and separated the valuable aluminum from other less valuable or worthless metals comprising the lighting fixture. The plaintiffs contend that when the machinery engulfed the aluminum light fixture to break it down, oil containing polychlorinated biphenyls ("PCBs") was released, covering the equipment and its conveyor belts and spilling onto the ground.[1] While Boston Edison generally disputes the fact that the streetlights in question contained any PCBs, it concedes this point for purposes of its summary judgment motions.

PCBs are complex compounds that are nonflammable and have excellent dielectric properties, meaning that they exhibit low electrical conductivity. Because of these qualities, PCBs were commonly used as coolants and lubricants in transformers, capacitors, and other electrical equipment prior to the mid-1970s. At that time, Congress enacted the Toxic Substances Control Act, which required, *inter alia*, the promulgation of PCB regulations by the United States Environmental Protection Agency.

The release of the PCBs allegedly shutdown the shredding system. The plaintiffs were thereafter required to retain the services of Jetline Services, Inc., an environmental cleanup company, to decontaminate the shredding system and the soil beneath it.

### B. *Procedural History*

On August 19, 1993, the plaintiffs filed a three-count complaint against Boston Edison and Grant. In Count I, the plaintiffs alleged that Boston Edison and Grant were liable for the costs of cleaning up the property pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"). In Count II, the plaintiffs alleged that Boston Edison and Grant "knowingly, wrongfully, and maliciously placed hazardous waste upon Plaintiff Sam–Man Realty's property constituting a trespass on that property." In Count III, the plaintiffs alleged that Boston Edison and Grant "unreasonably and materially interfered with Plaintiff Branch Companies [sic] reasonable use and enjoyment of their leased premises constituting a private nuisance." In their answers, Boston Edison and Grant cross-claimed each other for contribution and indemnification.

On September 1, 1994, Boston Edison filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, as well as a statement of undisputed facts in support of the motion. Boston Edison argued that there was no genuine issue of material fact and that it was entitled to judgment as a matter of law on two grounds: (1) that this court had no *in personam* jurisdiction over Boston Edison; and, (2) that the plaintiffs and Grant could not establish the essential elements of each of their claims.

---

1. "Plaintiffs" collectively refers to the party that owns the contaminated land, the Sam–Man Realty Corporation, as well as three "Branch" companies, Branch Metal Processing, Inc., Branch Processing, Inc., and the Branch Trading Company, Inc., all of which had some involvement with the operation of a metals processing business at that site.

Grant objected to the motion and filed a statement of disputed facts as required by Local Rule 12.1. *See* D.R.I.Loc.R. 12.1. The plaintiffs also objected to the motion and filed their own statement of undisputed facts. In addition, the plaintiffs filed a motion for partial summary judgment on the issue of liability under § 107(a)(3) of CERCLA. In so doing, the plaintiffs did not oppose, either factually or legally, Boston Edison's request for summary judgment on Counts II and III.

This court referred the cross motions for summary judgment to Magistrate Judge Boudewyns on November 14, 1994. Magistrate Judge Boudewyns held a hearing on these motions on January 5, 1995, and issued a Report and Recommendation on January 6, 1995. Magistrate Judge Boudewyns recommended that this court deny Boston Edison's summary judgment motions with respect to the issues regarding personal jurisdiction and CERCLA liability. Magistrate Judge Boudewyns further recommended that Boston Edison's motion for summary judgment be granted with respect to the plaintiffs' state law claims, and that the plaintiffs' cross motion for summary judgment be denied.

Boston Edison filed a partial objection to the Report and Recommendation on January 23, 1995. In so doing, Boston Edison challenged the magistrate judge's findings with respect to, *inter alia*, the personal jurisdiction and CERCLA issues. Neither Grant nor the plaintiffs objected to the Report and Recommendation, although all opposed Boston Edison's objection.[2]

Before this court could hold a hearing on Boston Edison's objection, Boston Edison filed a motion for leave of court to file a third-party complaint. Shortly thereafter, the plaintiffs filed a motion for leave to file an amended complaint. This court held a status conference on these motions on July 10, 1995. The parties and this court agreed that no action would be taken on the objection to the Report and Recommendation until after additional parties had been joined. On July 14, 1995, this court entered an order

granting the parties leave to join additional parties.

On July 24, 1995, Boston Edison filed a third-party complaint against six defendants: Bull HN Information Systems, Inc. ("Honeywell"), the Gemini Trading Corporation ("Gemini"), the Joseph Freedman Company, Inc. ("Freedman"), the Shetucket Iron and Metal Company, Inc. ("Shetucket"), the R.S.T. Reclaiming Co., Inc. ("R.S.T."), and Mandel Sherman.[3] Boston Edison alleged that each of these defendants had transported products containing hazardous materials to the Branch site for treatment and/or disposal. Accordingly, Boston Edison sought contribution from each of the defendants pursuant to CERCLA should it ultimately be found liable for any costs incurred by the plaintiffs.

On September 21, 1995, the plaintiffs filed an amended complaint. In it, the plaintiffs reiterated their intent to obtain contribution for their CERCLA cleanup costs from Boston Edison and Grant. In addition, the plaintiffs added several new defendants, all of whom had previously been named as defendants in Boston Edison's third-party complaint: Honeywell, Freedman, R.S.T., Gemini, and Shetucket. The plaintiffs also added Prouvost USA, Inc., a foreign corporation having its principal place of business in Jamestown, South Carolina and a successor-in-interest to an entity or entities, including the Prouvost–Lefebre Company, which formerly owned the Branch site. A flurry of cross- and counterclaims followed thereafter.

On February 26, 1996, Boston Edison filed a second motion for summary judgment pursuant to Rule 56 "on all claims asserted against it" by Honeywell, Shetucket, Prouvost USA, Inc., and Mandel Sherman. In this motion, Boston Edison raised the same issues relating to *in personam* jurisdiction and CERCLA liability that it did in its September 1, 1994 summary judgment motion. This court referred the motion to Magistrate Judge Boudewyns, who issued a Report and

---

**2.** Local Rule 32(c)(3) provides that "[a]bsent a timely objection . . ., the findings or report of the magistrate shall constitute the order of the court." D.R.I.Loc.R. 32(c)(3).

**3.** A notice of the voluntary dismissal without prejudice of Boston Edison's third-party claims against Freedman entered on September 19, 1995.

Recommendation on April 25, 1996 denying Boston Edison's motion and citing the pertinent sections from his first Report and Recommendation.

## II. DISCUSSION

Notwithstanding the myriad of issues raised in the cross motions for summary judgment before the magistrate judge, only two issues have been preserved through the timely objections of Boston Edison. Each of the parties' positions with respect to these issues is detailed below. For the sake of simplicity, this court has consolidated the issues and the parties. Thus, the numerous plaintiffs, both original and cross, who replied to Boston Edison's objection are collectively referred to as "the opposition." It should also be noted that Boston Edison was the only party to object to any of the Reports and Recommendations.[4]

### A. *Standard of Review*

■ At the outset, it is incumbent upon this court to determine the correct standard of its review. In addressing objections to pretrial orders issued by a magistrate judge, it is necessary to distinguish between orders that address dispositive matters and those that do not. In reviewing an objection to a magistrate judge's recommendation with respect to a dispositive issue, a district court "shall make a de novo determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made...." Fed.R.Civ.P. 72(b). The order entered by Magistrate Judge Boudewyns in this case clearly concerned a dispositive pretrial matter. As such, this court will conduct a plenary review of Magistrate Judge Boudewyns's Reports and Recommendations.

### B. *Summary Judgment*

■ The applicable law with respect to summary judgment is well-settled. Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and "identifying those portions of the pleadings, depositions, answers to interrogatories, ... admissions on file," and any accompanying affidavits "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (internal quotation marks omitted). This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554. Indeed, a summary judgment motion "may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323, 106 S.Ct. at 2553.

■ Once the moving party has satisfied its burden, the burden shifts to the nonmoving party to " 'contradict the showing by pointing to specific facts demonstrating that there is, indeed, a trialworthy issue.' " *Blackie v. State of Maine,* 75 F.3d 716, 721 (1st Cir.1996) (quoting *National Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 735 (1st Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2247, 132 L.Ed.2d 255 (1995)); *see also EEOC v. Steamship Clerks Union, Local 1066,* 48 F.3d 594, 602 (1st Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 65, 133 L.Ed.2d 27 (1995). This cannot be accomplished with a mere promise to produce admissible evidence at trial, but rather, the nonmovant must present affirmative evidence. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256–57, 106 S.Ct. 2505, 2514–15, 91 L.Ed.2d 202 (1986); *Rodriguez–Pinto v. Tirado–Delgado,* 982 F.2d 34, 39 (1st Cir.

---

**4.** A third issue relating to a motion filed by Boston Edison to strike certain affidavits and documents that accompanied the plaintiffs' summary judgment motions was preserved. However, any objections to Magistrate Judge Boudewyns's findings with respect to this issue were rendered moot by the fact that no objections were made with respect to Magistrate Judge Boudewyns's recommended disposition of the plaintiffs' cross-motion for summary judgment.

1993). This requires the nonmovant to "go beyond the pleadings" and direct the court's attention to specific facts that demonstrate the existence of a trialworthy issue. *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. at 2553.

## C. *Personal Jurisdiction*

 The applicable law with respect to personal jurisdiction is not as well-defined. Indeed, borrowing from Winston Churchill, the First Circuit has stated that the doctrinal vagaries of the concept of personal jurisdiction might best be defined as "a riddle wrapped in a mystery inside an enigma." *Donatelli v. National Hockey League,* 893 F.2d 459, 462 (1st Cir.1990). What is clear, however, is that personal jurisdiction "implicates the power of a court over a defendant." *Foster–Miller, Inc. v. Babcock & Wilcox Canada,* 46 F.3d 138, 143 (1st Cir.1995). Both the source of a federal court's power and its outer limits are defined exclusively by the Constitution. *See id.*

### 1. General Jurisdiction

 There are two different avenues by which a court may arrive at personal jurisdiction. *See id.* at 144. One path is that of general personal jurisdiction. " 'General jurisdiction exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state.' " *Id.* (quoting *United Elec. Workers v. 163 Pleasant St. Corp.,* 960 F.2d 1080, 1088 (1st Cir.1992)).

 In practice, general jurisdiction is "considerably more stringent" than the alternative route, specific personal jurisdiction. *Donatelli v. National Hockey League,* 893 F.2d at 463 (citation and internal quotation marks omitted). " '[S]ingle or isolated items of activities in a state . . . are not enough to subject [a party] to suit on causes of action unconnected with the activities there.' " *Id.* (quoting *International Shoe Co. v. State of Washington,* 326 U.S. 310, 317, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)). Rather, general jurisdiction lies where the " 'instances [of] continuous corporate operations within a state [are] thought so substantial and of such a nature as to justify suit against [a defendant] on causes of action arising from dealings entirely distinct from those activities.' " *Id.* (quoting *International Shoe Co. v. State of Washington,* 326 U.S. at 317, 66 S.Ct. at 158).

 Notwithstanding the fact that Magistrate Judge Boudewyns did not specifically address the question of whether this court has "general" personal jurisdiction over Boston Edison, the opposition suggests that, indeed, it does. The opposition asserts that Boston Edison's business contacts with Rhode Island are substantial. They direct this court's attention to the fact that Boston Edison: (1) had previously invoked the jurisdiction of this court by filing suit in Rhode Island in another matter; (2) currently purchases electrical capacity from Ocean State Power in Burriville, Rhode Island; and, (3) has contractual relationships with two Rhode Island companies.

In spite of the opposition's asseverations to the contrary, however, it is difficult for this court to see how Boston Edison's sporadic contacts with Rhode Island amount to anything more than isolated instances of corporate activity. Indeed, using the language employed by the Supreme Court in *International Shoe,* Boston Edison's activities in Rhode Island can hardly be said to be "continuous and systematic." *International Shoe Co. v. State of Washington,* 326 U.S. at 317, 66 S.Ct. at 158. Accordingly, this court finds that general personal jurisdiction does not exist.

### 2. Specific Jurisdiction

 "When general jurisdiction is lacking, the lens of judicial inquiry narrows to focus on specific jurisdiction." *Foster–Miller, Inc. v. Babcock & Wilcox Canada,* 46 F.3d at 144. This query requires a court to weigh "the legal sufficiency of a specific set of interactions as a basis for personal jurisdiction." *Id.* In this analytical exercise, "the applicable constitutional limits assume critical importance." *Id.* The First Circuit utilizes a three-part test to determine if sufficient contacts exist to exercise specific personal jurisdiction. *See Sawtelle v. Farrell,* 70

F.3d 1381, 1387 (1st Cir.1995); *Foster–Miller, Inc. v. Babcock & Wilcox Canada,* 46 F.3d at 144; *Ticketmaster–New York, Inc. v. Alioto,* 26 F.3d 201, 206 (1st Cir.1994).

▇▇▇▇ " 'First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum state activities.' " *Sawtelle v. Farrell,* 70 F.3d at 1389 (quoting *United Elec. Workers v. 163 Pleasant St. Corp.,* 960 F.2d at 1089). "Although this requirement is 'the least developed prong of the due process inquiry,' it serves the important function of focusing the court's attention on the nexus between a plaintiff's claim and the defendant's contacts with the forum." *Id.* (quoting *Ticketmaster–New York, Inc. v. Alioto,* 26 F.3d at 206). This requirement, although "flexible" and "relaxed," is "not met merely because a plaintiff's cause of action arose out of the general relationship between the parties; rather, the action must directly arise out of the specific contacts between the defendant and the forum state." *Id.*

▇▇▇▇ " 'Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable.' " *Id.* (quoting *United Elec. Workers v. 163 Pleasant St. Corp.,* 960 F.2d at 1089); *see also Foster–Miller, Inc. v. Babcock & Wilcox Canada,* 46 F.3d at 144. This inquiry ensures that "personal jurisdiction is not premised solely upon a defendant's 'random, isolated, or fortuitous' contacts with the forum state," *Sawtelle v. Farrell,* 70 F.3d at 1391 (quoting *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984)), and rests on two cornerstones. *Id.*

▇▇▇▇ One cornerstone is foreseeability. *See id.; Ticketmaster–New York, Inc. v. Alioto,* 26 F.3d at 207. That is, whether the non-resident defendant "should reasonably anticipate being haled into court" in the forum state. *See Ticketmaster–New York, Inc. v. Alioto,* 26 F.3d at 207 (quoting *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490

(1980)). "The enforcement of personal jurisdiction over a non-resident defendant is foreseeable when that defendant has established a continuing obligation between itself and the forum state." *See Sawtelle v. Farrell,* 70 F.3d at 1393.

"The second cornerstone, less frequently recognized as such, is voluntariness." *Ticketmaster–New York, Inc. v. Alioto,* 26 F.3d at 207; *see also Sawtelle v. Farrell,* 70 F.3d at 1391. While the First Circuit has not affirmatively defined what "voluntariness" is, it has suggested that it is present when a party "takes the initiative and causes foreseeable injury," *see, e.g., Ticketmaster–New York, Inc. v. Alioto,* 26 F.3d at 208. Perhaps more importantly, however, the First Circuit has declined to find voluntariness present through the mere placement of a product in a "stream of commerce." *See Sawtelle v. Farrell,* 70 F.3d at 1393; *Boit v. Gar–Tec Products, Inc.,* 967 F.2d 671, 681–83 (1st Cir. 1992); *Dalmau Rodriguez v. Hughes Aircraft Co.,* 781 F.2d 9, 15 (1st Cir.1986).

▇▇▇▇ The third part of the personal jurisdiction analysis is the requirement that " 'the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.' " *Sawtelle v. Farrell,* 70 F.3d at 1389 (quoting *United Electrical Workers v. 163 Pleasant St. Corp.,* 960 F.2d at 1089). The gestalt factors are as follows:

(1) the defendant's burden of appearing; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interests of all sovereigns in promoting substantive social policies.

*Id.* at 1394 (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 477, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985)). These factors serve to assist courts in achieving substantial justice. *See id.*

a. Forum State Contacts

▇▇▇▇ The first prong of the specific personal jurisdiction analysis can be dispensed with without delay. Beginning in August 1987, Boston Edison sold assorted

scrap metals, including streetlights, to Grant. Approximately two and one-half years later, Grant sold and delivered that same scrap to the Branch site in Rhode Island. The subsequent shredding purportedly caused PCBs to spill into the ground. · It is these contacts on which the assertion of personal jurisdiction rests.

### b. Purposeful Availment

The second prong of the jurisdiction analysis, whether Boston Edison purposefully availed itself of the privilege of conducting business in Rhode Island, cannot be disposed of quite so easily. This question requires this court to determine whether a party whose hazardous waste was transported to a particular state without its knowledge can nonetheless be considered to have purposefully availed itself of the privilege of conducting business in that state, thus subjecting it to the jurisdiction of that state's courts. This, in turn, necessitates a determination of whether a modified version of the "stream of commerce" theory of personal jurisdiction, which the First Circuit has explicitly rejected on a number of occasions, is nonetheless valid in the context of CERCLA.

While a substantial body of law has developed to assist courts in deciding personal jurisdiction issues, this court has discovered few cases that address the doctrine of personal jurisdiction in the context of CERCLA. Indeed, no circuit court has heretofore addressed the issue, and the few district courts that have addressed it have reached different conclusions. *Compare Chatham Steel Corp. v. Brown,* 858 F.Supp. 1130 (N.D.Fla.1994), *United States v. Conservation Chem. Co.,* 619 F.Supp. 162 (W.D.Mo.1985), *and Violet v. Picillo,* 613 F.Supp. 1563 (D.R.I.1985), *with Crown Cork & Seal Co. v. Dockery,* 886 F.Supp. 1253 (M.D.N.C.1995).

■ The analysis begins with an examination of the first of the two cornerstones of purposeful availment, foreseeability. Here, the question is whether Boston Edison should have reasonably anticipated being haled into court in Rhode Island. Notwithstanding the fact that Boston Edison may not have established a continuing obligation between itself and Rhode Island, the traditional litmus test for foreseeability, *see Sawtelle v. Farrell,* 70 F.3d at 1393, this court finds that Boston Edison should nonetheless have anticipated being haled into court in Rhode Island.

The foreseeability conclusion is a direct result of the nature of the transaction underlying this action. Here, Boston Edison sold streetlights which it knew might contain PCBs to Grant. *See* Affidavit of Kathleen Finigan Stone, at 2; Deposition of Joseph J. Argonish, Jr., at 9. Boston Edison understood that Grant would thereafter sell the scrap for profit. *See* Deposition of Arthur Reilly, at 38. It takes no stretch of the imagination to assume that Boston Edison knew that Grant would dispose of those elements found in the scrap that had little or no worth—specifically, the PCBs in the streetlights. Indeed, RFQ # 51415 called for the *"sale/disposal"* of the scrap metals. RFQ # 51415, at 1 (emphasis added).

■ Under CERCLA, a party that generates a hazardous substance and arranges for its disposal is strictly liable for the costs of any response to a release or threatened release of that substance, regardless of whether that party was at fault or whether the substance actually contributed to any damage. *See St. Paul Fire & Marine Ins. Co. v. Warwick Dyeing Corp.,* 26 F.3d 1195, 1197–98 (1st Cir.1994). Moreover, a party may be liable under CERCLA notwithstanding the fact that it had no knowledge of where the hazardous waste was being shipped. *See United States v. Conservation Chem. Co.,* 619 F.Supp. at 249.

■ The net result of this statutory scheme is that a party who generates hazardous substances should reasonably anticipate being subject to CERCLA liability irrespective of the fact that it might not have any idea where its hazardous substances might ultimately be released into the environment. In this case, because Boston Edison knew that some of its streetlights . might contain PCBs yet did not place any restrictions on how or where Grant might dispose of those PCBs, it should have reasonably anticipated the possibility of CERCLA liability arising anywhere as a result of the release of those

PCBs into the environment. In this vein, Boston Edison should have reasonably anticipated being haled into the courts of any state in which liability might arise: it is not difficult to envision that parties injured by the release of the hazardous substances would seek redress in that state.

The second cornerstone of purposeful availment, voluntariness, presents a much closer question for this court. This concept seemingly requires a court to find that a party established its contacts with a state on its own accord before it can exercise personal jurisdiction over that party. In essence, this amounts to the imposition of a knowing and intentional element in the personal jurisdiction analysis.

In responding to Boston Edison's objection to the Reports and Recommendations, the opposition avers that the requisite voluntariness is present in this case. Citing to the *Picillo* case, the opposition argues that "a company which injects a waste or waste-containing product into the stream of commerce and places no geographical limitation on its destination is subject to personal jurisdiction in the State where the waste or waste-containing product comes to be located." Defendant James G. Grant Company's Memorandum of Law in Opposition to Defendant Boston Edison Company's Motion for Summary Judgment, at 11.

The difficulty with this argument lies in its resemblance to the stream of commerce theory of personal jurisdiction. The First Circuit has repeatedly declined to accept this line of reasoning as a means by which personal jurisdiction could be established. *See Sawtelle v. Farrell,* 70 F.3d at 1393; *Boit v. Gar–Tec Products, Inc.,* 967 F.2d at 681–83; *Dalmau Rodriguez v. Hughes Aircraft Co.,* 781 F.2d at 15. Thus, in order for personal jurisdiction to lie, there must be a sufficient attenuation between the opposition's argument, which might be referred to as a "stream of hazardous waste" theory, and the traditional stream of commerce doctrine.

In an attempt to succeed in this endeavor, the opposition relies heavily on the reasoning employed in the *Picillo* decision. There, the court found that

what each defendant did was to place its wastes in the hands of an intermediary—one who, according to the record, quite literally operated in more than one state—with no reasonable expectation as to where these materials were destined for disposal, and with no attempt to specify the location, or even the state, in which its wastes were to be disposed. This chosen course of conduct must be viewed in the context of a hazardous waste disposal industry recognized by Congress to be permeated, on a national scale, by problems of improper waste disposal, and in particular by problems of dumping wastes—frequently taken across state lines—at illegal, inappropriate or remote sites. When so viewed, each defendant's decision to send its toxic wastes on a virtual one-way journey to anywhere represents a decision to avail itself of the benefits of a potentially boundless disposal market.

*Violet v. Picillo,* 613 F.Supp. at 1577 (footnote omitted).

At the time the *Picillo* decision issued, however, the preeminent case in the sphere of personal jurisdiction was *World–Wide Volkswagen.* There, the Supreme Court rejected a broad stream of commerce theory of personal jurisdiction, but left open the question of whether such a doctrine might be acceptable under different circumstances. *See World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. at 297–98, 100 S.Ct. at 567–68. The court in *Picillo* found such circumstances to be present in its case, relying heavily on the fact that the defendants had dispatched inherently dangerous products into a stream of commerce, as well as on the unique characteristics of the stream of commerce in which hazardous waste traveled. *See Violet v. Picillo,* 613 F.Supp. at 1576.

Subsequent to the *Picillo* decision, however, the First Circuit closed some of the questions left open by the Court in *World–Wide Volkswagen.* Specifically, it rejected the notion that the volume, value, or hazardous character of a product alone might be sufficient for a stream of commerce argument to satisfy the purposeful availment inquiry. *See Boit v. Gar–Tec Products, Inc.,* 967 F.2d at 682–83. The First Circuit decisions have the

tantamount effect of undercutting much of reasoning employed by the *Picillo* court. Notwithstanding this fact, this court believes that a "stream of hazardous waste" theory of personal jurisdiction nonetheless satisfies the voluntariness prerequisite to the exercise of personal jurisdiction.

The pivotal issue in this portion of the analysis is whether Boston Edison's contacts with this state were the result of "personalized affirmative choices reaffirmed at every significant juncture." *Ticketmaster–New York, Inc. v. Alioto*, 26 F.3d at 209 (footnote omitted). Here, Boston Edison's contacts with Rhode Island were the result of its own affirmative choices. Boston Edison sold the streetlights to Grant knowing that they might contain PCBs having neither resale nor use value and that they would ultimately have to be disposed. At the same time, Boston Edison had the ability to place restrictions on how and where the PCBs would be disposed, thereby protecting itself against suit in a particular jurisdiction, but chose not to place any restrictions on Grant.[5]

Boston Edison's head-in-the-sand approach is particularly important in light of the liability scheme set forth in CERCLA. Boston Edison should have known that it would ultimately be liable for the costs of cleaning up the PCBs, should they ever be released into the environment, in any state in which they ultimately came to be disposed. Moreover, Boston Edison should have understood that any litigation arising out of such liability would more than likely be commenced in that state. Thus, Boston Edison's election to place no restriction on the method or place of disposal is tantamount to an affirmative choice to submit to jurisdiction wherever these waste products fouled the environment. The voluntariness cornerstone of purposeful availment is present based on Boston Edison's failure to protect itself from the reach of the Rhode Island court.

In reaching this conclusion, this court is careful to note that it is not altering the principles of personal jurisdiction to reflect the broad scope and expansive liability of CERCLA. Indeed, this court has not forgotten that it is the Constitution that it is expounding, and that its mandate is superior to any ordinary act of the legislature. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). This court is, however, taking into account what Boston Edison should have known with respect to its contacts with this state in applying the subjective portion of the personal jurisdiction analysis.

Having found that Boston Edison purposefully availed itself of this jurisdiction, this court turns to address the remaining hurdle for the exercise of personal jurisdiction.

### c. The Gestalt Factors

The First Circuit has often noted that the personal jurisdiction inquiry should not be a mechanical exercise. *See Sawtelle v. Farrell*, 70 F.3d at 1394; *Ticketmaster–New York, Inc. v. Alioto*, 26 F.3d at 209. Concepts of reasonableness and fairness "must illuminate the minimum contacts analysis." *Sawtelle v. Farrell*, 70 F.3d at 1394. The gestalt factors, detailed above, were identified by the Supreme Court in *Burger King Corp. v. Rudzewicz*, 471 U.S. at 477, 105 S.Ct. at 2184, and named by the First Circuit. *See Sawtelle v. Farrell*, 70 F.3d at 1394. They serve as a means by which a court can ensure it is achieving substantial justice in the exercise of its jurisdiction. *See id.*

### i. The Burden of Appearance

The first factor is the burden on the defendant of appearing in the forum state. In analyzing this burden, this court recognizes the fact that "defending in a foreign jurisdiction almost always presents some measure of inconvenience...." *Sawtelle v. Farrell*, 70 F.3d at 1395. As such, "this factor becomes meaningful only where a party can demonstrate a 'special or unusual burden.'" *Id.* (quoting *Pritzker v. Yari*, 42 F.3d 53, 64 (1st Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1959, 131 L.Ed.2d 851 (1995)).

---

5. The inclusion of Addendum I to the RFQs prepared by Boston Edison beginning in 1989 indicates the ease with which Boston Edison could have placed restrictions on Grant's disposal of the PCBs.

The burden on Boston Edison of appearing in Rhode Island is not special or unusual. Unlike in the majority of cases which have been dismissed because the burden on the defendant was too great, Boston Edison is not located an appreciable distance from Rhode Island. *See Ticketmaster–New York, Inc. v. Alioto*, 26 F.3d at 210. Indeed, the distances between Boston Edison's facilities in Everett, South Boston, Plymouth, and Dorchester, Massachusetts and the State of Rhode Island are generally less than 100 miles.

### ii. Interest of the Forum

The purpose of the second factor is to determine the extent to which the State of Rhode Island has an interest in obtaining jurisdiction over Boston Edison. *See Sawtelle v. Farrell*, 70 F.3d at 1395. It is generally recognized that a forum state has a demonstrable interest in obtaining jurisdiction over a defendant who has caused a tortious injury within its borders. *See id.* In this vein, this court believes that Magistrate Judge Boudewyns correctly relied on the *Picillo* court's finding that "Rhode Island has an extraordinarily strong sovereign interest in providing a forum for action concerning injury to land within its borders." January 6, 1995 Report and Recommendation, at 11.

### iii. The Plaintiffs' Convenience

This court need not dwell on the third factor, a plaintiff's interest in obtaining convenient and effective relief. It is well-settled that "a plaintiff's choice of forum must be accorded a degree of deference with respect to the issue of its own convenience." *Sawtelle v. Farrell*, 70 F.3d at 1395 (citing *Foster–Miller, Inc. v. Babcock & Wilcox Canada*, 46 F.3d at 151; *Pritzker v. Yari*, 42 F.3d at 64; *Ticketmaster–New York, Inc. v. Alioto*, 26 F.3d at 211). Notwithstanding the minimal burden that would be placed on the opposition were it forced to litigate this matter elsewhere, specifically, Massachusetts, it would nonetheless be more convenient for the opposition to litigate this matter in Rhode Island in light of the circumstances underlying the nature of this action and the number of parties involved.

### iv. The Administration of Justice

The fourth factor, the interest of the judicial system in obtaining the most effective administration of justice, supports the conclusion that the most effective resolution of this controversy would be achieved with the exercise of jurisdiction by this court. The dismissal of Boston Edison from this action will potentially result in the piecemeal litigation of the CERCLA liability issue. Indeed, it is unclear whether the plaintiffs would be able to refile this case in any other jurisdiction in which jurisdiction would lie over *all* the parties named in this action.

### v. Common Interests of the Sovereigns

The final factor requires this court to consider the common interests of all sovereigns in promoting substantive social policies. *See id.* at 1395; *Pritzker v. Yari*, 42 F.3d at 64. Here, this implicates the ability of the State of Rhode Island to provide a convenient forum for its residents to redress injuries inflicted by nonresident actors. *See Sawtelle v. Farrell*, 70 F.3d at 1395. This interest is particularly strong in this case in light of the national market for hazardous waste disposal and the broad scope of potential CERCLA liability.

### 3. Summation

In conclusion, by not taking any steps to restrict where the hazardous substances could be disposed, Boston Edison deliberately subjected itself to the jurisdiction of any state in which liability might arise as a result of the sale of the streetlights. Accordingly, this court concludes that Boston Edison has sufficient minimum contacts with the State of Rhode Island for personal jurisdiction to lie.

### D. *CERCLA Liability*

This court now turns to address those portions of the Reports and Recommendations addressing Boston Edison's motions for summary judgment on the issue of CERCLA liability.[6] Boston Edison had argued that it

---

6. This court notes that Magistrate Judge Boudewyns recommended that summary judgment be granted in Boston Edison's favor on a number of state law claims. None of the parties objected

should be granted summary judgment because the plaintiffs could not establish essential elements of their CERCLA claim. Magistrate Judge Boudewyns disagreed.

■ CERCLA was enacted by Congress " 'to facilitate the cleanup of potentially dangerous hazardous waste sites, with a view to the preservation of the environment and human health.' " *United States v. USX Corp.*, 68 F.3d 811, 814 (3d Cir.1995) (quoting *Tippins, Inc. v. USX Corp.*, 37 F.3d 87, 92 (3d Cir.1994)). "It is a broad response and reimbursement statute. It imposes strict liability on responsible parties." *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d 1146, 1150 (1st Cir.1989).

■ Under CERCLA, four parties may be responsible for the costs of an environmental cleanup: "the owner or operator of a contaminated vessel or facility; the owner and operator of a facility at the time it became contaminated; any person who arranges for the transport or disposal of hazardous wastes; and any person who accepts hazardous wastes for the purposes of transport or disposal." *John S. Boyd Co. v. Boston Gas Co.*, 992 F.2d 401, 404 (1st Cir.1993); *see also* 42 U.S.C. § 9607(a). The first two parties are commonly referred to as "owners" and "operators." *United States v. USX Corp.*, 68 F.3d at 815. The third class of persons are referred to as "generators" or "arrangers." *Id.* The final class of persons are called "transporters." *Id.*

■ The classes of responsible parties reflect "CERCLA's 'essential purpose' of making 'those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created.' " *John S. Boyd Co. v. Boston Gas Co.*, 992 F.2d at 405 (quoting *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1081 (1st Cir.1986)). CERCLA makes these parties liable to the government or to other private parties for the costs of cleanup. *See id.*

■ One manner in which a party may be liable to a private party under CERCLA is for contribution pursuant to 42 U.S.C. § 9613(f)(1). This statute provides that " '[a]ny person may seek contribution from any other person who is liable or potentially liable' [under 42 U.S.C. § 9607(a) ] for response costs." *United Technologies Corp. v. Browning–Ferris Indus., Inc.*, 33 F.3d 96, 98 (1st Cir.1994) (quoting 42 U.S.C. § 9613(f)(1)), *cert. denied*, —— U.S. ——, 115 S.Ct. 1176, 130 L.Ed.2d 1128 (1995). This allows a party who has incurred costs as a result of cleaning up a contaminated site to obtain reimbursement from other parties who contributed to the pollution of the site but not the cleanup costs. In order to establish a prima facie cause of action under § 9607(a), a plaintiff must establish that:

> (1) [the] defendant fits one of the four classes of responsible parties ...; (2) the site is a facility; (3) there is a release or threatened release of hazardous substances at the facility; (4) the plaintiff incurred costs responding to the release or threatened release; and (5) the costs and response actions conform to the National Contingency Plan set up under the Act and administered by the EPA in order to prioritize hazardous substance release sites throughout the nation.

*B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1198 (2d Cir.1992).

■ At issue in this case is the question of whether Boston Edison can properly be classified as a responsible party, specifically, as an arranger. Boston Edison contends that it cannot be so classified because it never intended to dispose of any hazardous substances. In support of its position, Boston Edison focuses on the mens rea required on the part of a party before it can be deemed an arranger; it contends that some form of subjective intent to dispose of hazardous waste is required of such a party. Notwithstanding the fact that this court does not ultimately find in Boston Edison's favor, Boston Edison correctly depicts the CERCLA liability scheme.

to these recommendations, thus, those portions of the Reports and Recommendations constitute an order of this court. D.R.I.Loc.R. 32(c)(3).

■ There is little question that Magistrate Judge Boudewyns correctly found "that Congress created a strict liability scheme when it enacted Section 107(a)(3) of CERCLA." January 6, 1995 Report and Recommendation, at 12–13. A broad survey of the relevant case law leaves no doubt that the CERCLA statutory scheme imposes strict liability on certain parties for the clean-up of hazardous substances that have been released into the environment. Indeed, the First Circuit has stated that "a person that generates hazardous substances and arranges for their disposal is *strictly liable,* regardless of whether the person was at fault or whether the substance actually caused or contributed to any damage...." *St. Paul Fire & Marine Ins. Co. v. Warwick Dyeing Corp.,* 26 F.3d at 1197–98.

■ In order for the strict liability standard to apply, however, a party must first be deemed to be a responsible party—in this case an arranger—under CERCLA. Whether a party arranged for the disposal of a hazardous substance, thereby falling within one of the classes of potentially liable parties under CERCLA, depends on the facts of each case. *See Florida Power & Light Co. v. Allis Chalmers Corp.,* 893 F.2d 1313, 1317 (11th Cir.1990). While the definition of "arranged" is not entirely clear, "[i]f a party merely sells a product, without additional evidence that the transaction includes an 'arrangement' for the ultimate disposal of a hazardous substance, CERCLA liability would not be imposed." *Id.*

■ It is here that Boston Edison's subjective intent argument has merit. The element of subjective intent is important for purposes of determining when liability for the disposal of a substance should arise on the part of a party who sold those wastes. Indeed, as the Seventh Circuit noted in *G.J. Leasing Co. v. Union Elec. Co.,* 54 F.3d 379 (7th Cir.1995), there are instances in which CERCLA liability should not lie.

■ The paradigmatic case in which CERCLA liability should not arise involves the sale of a hazardous substance to another party for productive use. Indeed, it is difficult to equate this type of transaction with the disposal of a hazardous substance or even the making of arrangements for its disposal. *See id.* at 384; *see also Florida Power & Light Co. v. Allis Chalmers Corp.,* 893 F.2d at 1317. Indeed, the Seventh Circuit noted that this distinction is

> necessary because otherwise the sale of an automobile would be the disposal of a hazardous substance, since an automobile contains a battery, and a battery contains lead, which is a hazardous substance.... And the sale of any building that contained asbestos insulation (and we are told that more than 700,000 commercial buildings in the United States fit this description) would be the disposal of a hazardous substance, because while the asbestos is harmless as long as the asbestos fibers are not allowed to leak out of the walls or other building components in which the insulation was placed, asbestos is, like lead, a hazardous substance.

*G.J. Leasing Co. v. Union Elec. Co.,* 54 F.3d at 384.

■ In this vein, Boston Edison contends that there are no material facts in dispute as to whether it arranged for the disposal of PCBs through its transaction with Grant. Boston Edison contends that it only intended to sell scrap metals to Grant for resale on the scrap metals market. It alleges that there is no dispute as to the fact that the purpose of the transaction was not to dispose of the PCBs that might have contained capacitors.

While Boston Edison's position may ultimately be validated, Magistrate Judge Boudewyns was correct in finding that there are sufficient facts in dispute to preclude the issuance of a judgment in favor of Boston Edison at this juncture. Indeed, the following facts are in dispute:

1. Whether Boston Edison knew that the streetlights in its possession contained PCBs.

2. Whether Boston Edison knew that the streetlight capacitors containing the PCBs had no market value on the resale market.

3. Whether RFQ #51415 provided for the disposal of any scrap materials.

4. Whether Boston Edison intended that the PCBs be disposed of by Grant.

This litany clearly indicates a dispute as to whether Boston Edison entered into the transaction with Grant with the intent that Grant dispose of the PCBs. As such, Boston Edison has failed to establish that there exist no material facts in dispute. Accordingly, Boston Edison's motion for summary judgment must be denied.

### III. CONCLUSION

For the reasons detailed above, this court finds that Boston Edison has sufficient contacts with this jurisdiction to warrant the exercise of this court's personal jurisdiction over it. Further, this court finds that Boston Edison has failed to establish the lack of a dispute as to any of the material facts in this case, and, accordingly, denies Boston Edison's motion for summary judgment.

SO ORDERED.

### Report and Recommendation

BOUDEWYNS, United States Magistrate Judge.

The matter before the court is a review of defendant's, Boston Edison Company ("Boston Edison"), motion for summary judgment (which includes a claim that this Court lacks personal jurisdiction over Boston Edison) and plaintiffs', Branch Metal Processing, Inc., Branch Processing, Inc., and Branch Trading Company, Inc., (hereinafter referred to as the "Branch companies"), and Sam–Man Realty, Corp. ("Sam–Man"), motion for partial summary judgment against Boston Edison. This matter has been referred to me for preliminary review, findings, and recommended disposition.[1] As discussed below, I recommend that defendant's, Boston Edison, motion for summary judgment be denied as to plaintiffs' claim pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a), and as to James G. Grant Co., Inc.'s ("Grant") cross-claim for contribution. I also believe this Court quite clearly has personal jurisdiction over Boston Edison. In addition, I recommend that plaintiffs' motion for partial summary judgment be denied.[2] However, I recommend that summary judgment be entered with regards to plaintiffs' claims of trespass and nuisance and defendant Grant's cross-claim for indemnification.

### Factual Background

Plaintiffs are corporations located in Rhode Island. The Branch companies entered into an oral agreement with Sam–Man to lease a portion of Sam–Man's property and a building specifically constructed thereon for the purpose of operating a scrap metal shredding business. Defendant Grant is a Massachusetts corporation with its principal place of business in Massachusetts. Grant's business includes demolition contracting, scrap processing, heavy equipment rental, rigging, and removal and replacement of fuel storage tanks. Defendant Boston Edison is an electric utility located in Massachusetts. Boston Edison generates power at its own power plants located in Massachusetts. Boston Edison also routinely amasses cable, line wire[3] and other electrical equipment such as

---

**1.** 28 U.S.C. § 636(b)(1)(B); *Mathews v. Weber*, 423 U.S. 261, 96 S.Ct. 549, 46 L.Ed.2d 483 (1976).

**2.** Boston Edison has also filed a motion to strike the Sherman and Brickle affidavits which were attached to plaintiffs' pleadings and to strike all unauthenticated and otherwise inadmissible documents from the summary judgment record. Upon review of the affidavits in question, it is clear that the affidavits were given by competent persons. As for striking "unauthenticated and otherwise inadmissible documents" from the summary judgment record, Boston Edison argues that "[b]ecause [it] has not completed its discovery into the Plaintiff's dealings and activities surrounding the Branch site and the scrap

metal that the Plaintiff's conducted there, Boston Edison is not yet in a position to fully assess the veracity and reliability of the information and data reflected in a number of those documents." This does not support Boston Edison's motion to strike but, rather, indicates that Boston Edison's own motion for summary judgment may have been premature. The motion to strike should be denied.

**3.** Electricity moves around the Boston Edison system over cable and line wire. "Cable" is buried underground or laid within underground tunnel systems accessed through manholes. "Line wire" is strung from utility poles and other above-ground structures.

streetlights that can no longer be used and sells it to scrap metal vendors.

In March of 1987, Boston Edison, through its Stores and Services Department, prepared a Request for Quotations ("RFQ") # 51415 to be sent to selected scrap metal vendors for the purpose of receiving offers to purchase the utility's scrap. After receiving several bids, Boston Edison awarded a contract to Grant. In August of 1989, Boston Edison began the RFQ process anew and submitted RFQ # 51730 for consideration to various scrap metal dealers, including Grant. In late 1989, Boston Edison became concerned about the potential environmental consequences of dealing with scrap metal dealers. As a result, Boston Edison included an addendum ("Addendum I") to RFQ # 51730 and to its future scrap sales contracts. Grant responded to RFQ # 51730 and Boston Edison subsequently awarded a second scrap metal contract to Grant.

The scrap metal contracts between Grant and Boston Edison provided that the "Scope of Work" consisted of "the sale/disposal of all scrap metals." In addition, Addendum I required the scrap metal dealer to obtain all necessary permits and licenses, and to conform to all applicable federal and state laws, "in connection with its handling, use, transportation, storage and disposal" of the scrap. Boston Edison also reserved the right to inspect the dealer's premises and operation to "verify the existence of applicable permits or licenses required in connection with the handling, use, transportation, storage and disposal" of the scrap. Further, Addendum I required the scrap dealer to obtain "environmental impairment insurance" and to indemnify the utility for any damage resulting from the "handling, use, transportation, storage and disposal" of the scrap.

In late 1989, Grant and Branch Trading entered into an agreement whereby Grant would deliver a truckload of streetlights to the Branch companies on or around January 31, 1990. Grant later agreed to deliver an additional truckload of streetlights to the Branch companies on or around April 6, 1990. Once the Branch companies received the streetlights, they began shredding them in order to prepare them for sale. "When the shredding system engulfed the streetlights purchased from Grant, PCB [4] oil was released covering Branch's shredding equipment, its conveyor belts and the ground." [5] The Branch companies thereafter tested several capacitors from the streetlights purchased from Grant. The results showed high levels of PCB content in the oil of the capacitors. Additional capacitors from the remaining streetlights in Grant's possession were tested. The results indicated extremely high levels of PCB concentration in the oil contained in the capacitors.

In January 1991, plaintiffs informed Grant that Boston Edison's streetlights, which had PCB-containing capacitors, had contaminated their property. In turn, Jim Jamieson, an employee at Grant, informed Kathleen Finigan Stone, Boston Edison's Senior Environmental Engineer, that Grant was having problems with the capacitors. In April, 1991, Grant again informed Boston Edison that plaintiffs were claiming that Sam–Man's property was contaminated by PCB-containing capacitors found in the streetlights.[6] Grant subsequently notified Boston Edison that it would not accept any more streetlights from Boston Edison until the Branch companies' allegations were resolved. In response, Boston Edison informed Grant that the utility would remove the capacitors itself.

4. "Polychlorinated biphyenyls ("PCBs") are complex compounds that, among other things, are nonflammable and have excellent dielectric properties, meaning that they exhibit low electrical conductivity. Because of these qualities, PCBs were commonly used as coolants and lubricants in transformers, capacitors, and other electrical equipment prior to the mid–1970s, when Congress enacted the Toxic Substance Control Act ("TSCA") in response to concerns about PCBs' harmfulness to human health and the environment. As it was required to under TSCA, the United States Environmental Protection Agency ("EPA") issued PCB regulations in the late 1970s." Memorandum in Support of Motion for Summary Judgment at 9–10.

5. Sherman Aff. at ¶ 10.

6. Boston Edison conceded, for purposes of its motion for summary judgment only, that Grant received streetlights which had PCB-containing capacitors from the utility. Memorandum in Support of the Motion for Summary Judgment at 2.

However, Boston Edison failed to do so, and the utility eventually contracted with Grant to remove the capacitors from the remaining streetlights on Grant's property.[7]

On August 19, 1993, plaintiffs filed a complaint against Boston Edison and Grant. In their complaint, plaintiffs allege the following: in Count I, defendants, Boston Edison and Grant, are liable to the plaintiffs for the cost of clean-up of the property pursuant to CERCLA; in Count II, defendants, Boston Edison and Grant, "knowingly, wrongfully, and maliciously placed hazardous waste upon plaintiff Sam–Man Realty's property constituting a trespass on that property;"[8] and in Count III, defendants', Boston Edison and Grant, "actions unreasonably and materially interfered with plaintiff Branch Companies' reasonable use and enjoyment of their leased premises constituting a private nuisance."[9] In its answer to plaintiffs' complaint, Boston Edison cross-claimed against Grant for contribution and indemnification. Similarly, Grant, in its answer to plaintiffs' complaint, cross-claimed against Boston Edison for contribution and indemnification.[10]

Boston Edison has now filed a motion for summary judgment. In support of its motion, Boston Edison alleges that this Court lacks *in personam* jurisdiction over Boston Edison and that plaintiffs, Branch Metal Processing, Inc., Branch Processing, Inc., Branch Trading Company, Inc., and Sam–Man Realty, Corp., cannot establish essential elements of their claim pursuant to the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.* ("CERCLA"). In response, plaintiffs request partial summary judgment against Boston Edison "on the issue of liability ... under CERCLA section 107(a)(3)."[11]

*Discussion*

Both motions for summary judgment are made pursuant to FRCP 56(c), which states:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The initial burden in a summary judgment motion requires the moving party to show that no genuine issue exists as to any material fact.[12] The burden then shifts to the non-moving party to show that there is at least one factual issue that is both "genuine" and "material." The factual issue is "genuine" if there is sufficient evidence favoring the non-moving party on which a jury could reasonably return a verdict for that party.[13] If the evidence is based on conjecture, merely colorable, or is not significantly probative of the facts alleged in the complaint, there is no "genuine" issue, and summary judgment may be granted.[14] "This evidence 'cannot be conjectural or problematic; it must have substance in that it limns differing versions of the truth which a fact finder must resolve at

---

7. Jamieson Dep. at 98–99.

8. Complaint at ¶ 18.

9. *Id.* at ¶ 20.

10. Although Grant does not specifically request indemnification, Grant does request, in Count I of its cross-claim, "judgment against Boston Edison in the event it is found liable to the plaintiffs, such judgment to include any interest or costs awarded." Grant's Cross-claim at ¶ 8. Grant has not objected to Boston Edison's reference to Grant's cross-claims as claims against Boston Edison for both contribution and indemnification.

11. Memorandum in Objection to Boston Edison's Motion for Summary Judgment at 40.

12. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

13. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). In a summary judgment motion, the Court will not resolve questions of credibility or conflicting inferences. Rather, it will assess the sufficiency of evidence as a matter of law, resolving all factual disputes in favor of the opponent. *Id.*

14. *Id.; First Nat'l. Bank v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968); *Local No. 48, United Brotherhood of Carpenters and Joiners v. United Brotherhood of Carpenters and Joiners*, 920 F.2d 1047, 1050 (1st Cir.1990).

an ensuing trial.' "[15] The issue of fact is "material" if the dispute necessarily "affect[s] the outcome of the suit."[16] The Court's function is to determine whether or not such a genuine issue exists, and not to resolve such existing factual issues.[17]

If the Court determines that no genuine issue of material fact exists, the Court must then determine whether the movant is entitled to judgment as a matter of law. In making this determination, the Court considers the facts from the record, and makes inferences therefrom in the light most favorable to the nonmoving party.[18]

*Boston Edison's Motion for Summary Judgment*

### 1. *Personal Jurisdiction* [19]

Boston Edison claims that its contacts with Rhode Island are insufficient to support this Court's assertion of personal jurisdiction over it. The burden of establishing personal jurisdiction rests with the plaintiff.[20] This Court has frequently addressed what must be shown in order for the Court to exercise personal jurisdiction over a non-resident defendant.[21] The Rhode Island long-arm statute[22] extends to the full reach of the due process clause[23] and explicitly authorizes the judicial exercise of jurisdiction to the extent that such jurisdiction does not violate the Constitution. Since a finding of constitutionally permissible jurisdiction implies compliance with the Rhode Island long-arm statute, this Court need consider only whether the exercise of jurisdiction over the defendants satisfies the due process clause of the Fourteenth Amendment.

In a long line of cases, the United States Supreme Court has sought to define the Fourteenth Amendment boundaries of personal jurisdiction. The basic standard announced by the Supreme Court is as follows:

> [D]ue process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend

15. *Mesnick v. General Elec. Co.*, 950 F.2d 816 (1st Cir.1991) (quoting *Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 181 (1st Cir.1989)).

16. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

17. *Id.* at 249, 106 S.Ct. at 2510.

18. *Anderson*, 477 U.S. at 248, 255, 106 S.Ct. at 2510, 2513. *See Blanchard v. Peerless Ins. Co.*, 958 F.2d 483, 485 (1st Cir.1992); *Continental Casualty Co. v. Canadian Universal Ins. Co.*, 924 F.2d 370, 373 (1st Cir.1991).

19. Defendant, Boston Edison, preserved its personal jurisdiction objection in its responsive pleading. Although some courts have entered summary judgment on jurisdictional grounds, other courts have ruled that summary judgment is an inappropriate vehicle for contesting personal jurisdiction over the parties. *See* 10 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2713 (1983). The matter is rather straight-forward in this case and need not be dealt with in a separate motion.

20. *Donatelli v. National Hockey League*, 893 F.2d 459 (1st Cir.1990)

21. *Thompson Trading Ltd. v. Allied Lyons PLC*, 123 F.R.D. 417 (D.R.I.1989); *Levinger v. Mat-* thew Stuart & Co., 676 F.Supp. 437 (D.R.I.1988). In *Levinger* the Court noted:

> Whether a federal court has personal jurisdiction over a defendant depends upon two criteria: (1) whether the mandates of the forum state's long-arm statute have been satisfied, and (2) whether the defendant has been hailed into the particular court in accordance with the due process clause of the Fourteenth Amendment to the United States Constitution. Since the Supreme Court of Rhode Island has held that Rhode Island's long-arm statute reaches to the full breadth of the Fourteenth Amendment ... one need only examine the foundation for the second criterion listed above ... (citations omitted).

676 F.Supp. at 439.

22. The Rhode Island long-arm statute provides:

> Every foreign corporation, every individual not a resident of this state ... and every partnership or association, composed of any person or persons, not such residents, that shall have the necessary minimum contacts with the state of Rhode Island, shall be subject to the jurisdiction of the state of Rhode Island ... in every case not contrary to the provisions of the constitution or laws of the United States.

R.I.G.L. § 9–5–33(a) (1985).

23. *Conn v. ITT Aetna Finance Co.*, 105 R.I. 397, 402, 252 A.2d 184, 186 (1969).

"traditional" notions of "fair play and substantial justice."[24]

Further, the sufficiency of minimal contacts to support an exercise of jurisdiction cannot be determined by any set formula or rule of thumb, but must rest on a consideration of what is fair and reasonable in the circumstances of each particular case.[25] Whether due process is satisfied depends upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to ensure.[26]

Two doctrines relating to personal jurisdiction have emerged in recent decisions. These two doctrines provide a helpful framework for analysis of this case. First, general personal jurisdiction is said to exist where a defendant has such continuous and systematic contacts with the forum that bringing him into court on any matter, whether arising out of those contacts or not, does not offend the *International Shoe* due process standard.[27] The second doctrine, that of specific personal jurisdiction, is said to exist if the claim for relief sued upon arises out of or relates to a defendant's contacts with the forum state.[28] If so, then specific personal jurisdiction may be found based on the relationship among the defendant, the forum, and the litigation.[29] This is a case where specific, not general, jurisdiction applies, since the claims brought by plaintiffs directly relate to Boston Edison's and Grant's contacts with Rhode Island.

A court may assert specific jurisdiction when the claims "arise out of" or are "directly related to" the defendant's contacts with the forum state.[30] Where, as here, a defendant injects dangerous toxic substances into the stream of commerce through an intermediary and places no geographical limitation on its destinations, the defendant is subject to specific jurisdiction in the state where the toxic substance comes to be located.[31] In addition, this Court has recognized that "Rhode Island has an extraordinarily strong sovereign interest in providing a forum for action concerning injury to land within its borders."[32]

In the present case, it is undisputed that PCBs are hazardous. In the mid–1970s, Congress enacted the Toxic Substances Control Act in response to concerns about PCBs' harmfulness to human health and the environment.[33] As it was required to under the Act, the Environmental Protection Agency issued PCB regulations.[34] Boston Edison should have known that it was dispatching hazardous waste, PCBs in this instance, into a stream of commerce broad enough to include any and all states. Boston Edison requested bids from scrap metal vendors in order to sell its scrap metals. Boston Edison did not place any restrictions on the destination of its streetlights or its scrap metal when it accepted Grant's bid. More importantly, Boston Edison did not restrict Grant from selling the streetlights containing PCBs to plaintiffs, all of whom are Rhode Island

---

**24.** *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940)).

**25.** *Sandstrom v. ChemLawn Corp.*, 904 F.2d 83 (1st Cir.1990).

**26.** *International Shoe Co.,* 326 U.S. at 319, 66 S.Ct. at 159.

**27.** *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984); *Glater v. Eli Lilly & Co.*, 744 F.2d 213, 215 (1st Cir.1984).

**28.** *Id.*

**29.** *Id.*

**30.** *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Glater v. Eli Lilly & Co.*, 744 F.2d 213 (1st Cir.1984).

**31.** *Violet v. Picillo*, 613 F.Supp. 1563, 1577 (D.R.I.1985) ("Rather, these defendants dispatched into that stream [of commerce] volatile and dangerous toxic substances—and did so without determining where these substances would come to rest. As other courts have recognized, and as common sense suggests, where a defendant deals in such inherently dangerous products, a lesser showing than is ordinarily required will support jurisdiction.").

**32.** *Violet v. Picillo*, 613 F.Supp. at 1579.

**33.** Memorandum in Support of the Motion for Summary Judgment at 9.

**34.** *Id.* at 10.

corporations.[35] Thus, in accordance with *Picillo*, this Court has jurisdiction over Boston Edison where Boston Edison dispatched into the stream of commerce hazardous substances without restricting in any way the destination of these substances.

## 2. *CERCLA Claim*

Boston Edison argues that it should be granted summary judgment because the plaintiffs cannot establish essential elements of their claim pursuant to the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.* ("CERCLA"). The applicable section defining Boston Edison's potential liability for purposes of the CERCLA statute is Section 107(a)(3). This section states in relevant part:

> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or operated by another party or entity and containing such hazardous substances ...

(4) ... from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable ... [36]

Boston Edison argues that "[g]iven the plain statutory language requiring that the defendant have 'arranged for' disposal of hazardous substances, the critical question underlying section 107(a)(3) liability is ... whether the defendant *intended* the transaction to serve as a means to dispose of hazardous substances." [37] While courts have supported defendant's argument,[38] this Court has adopted the view that Congress created a strict liability scheme when it enacted Section 107(a)(3) of CERCLA.[39] "Thus, if the plaintiff is able to prove at trial the statutory elements of Section 107(a)(3), [the defendant] may be held liable *without proof of knowledge or intent.*" [40]

Boston Edison, however, maintains that it is not liable under CERCLA because it never *intended* to dispose of hazardous substances through its scrap metal sales to Grant.[41]

**35.** Jamieson Aff. at ¶ 10 (Exhibit 1 from Grant's submissions) ("Boston Edison never placed any restrictions on the destination of the scrap, including the streetlights."); Poindexter Dep. at 64 (Exhibit 11 from Grant's submissions).

**36.** 42 U.S.C. § 9607(a)(3).

**37.** Memorandum in Support of Motion for Summary Judgment at 18.

**38.** *Amcast Industries Corp. v. Detrex Corp.,* 2 F.3d 746 (7th Cir.1993); *United States v. Cello–Foil Prods., Inc.,* 848 F.Supp. 1352, 1357 (W.D.Mich. 1994).

**39.** *Violet v. Picillo,* 648 F.Supp. 1283, 1289 (D.R.I.1986), *overruled on other grounds by United States v. Davis,* 794 F.Supp. 67 (D.R.I.1992) ("the Court overrules that portion of *Picillo* which allows equitable defenses" against plaintiff's CERCLA claim). While counsel for Boston Edison argues that there are recent cases which disagree with *Picillo, see supra* at n. 38, it is equally clear that there are recent cases which agree with *Picillo. See United States v. Aceto Agric. Chems. Corp.,* 872 F.2d 1373, 1379–81 (8th Cir.1989); *Chatham Steel Corp. v. Brown,* 858 F.Supp. 1130 (N.D.Fla.1994); *United States v. Maryland Sand, Gravel and Stone Company,* No. HAR 89–2869, 1994 WL 541069 (D.Md.1994).

**40.** *Id.* (emphasis added). For the list of these statutory elements *see infra* at p. 921.

**41.** Memorandum of Law in Support of Motion for Summary Judgment at 15. Boston Edison also raises two additional arguments in support of its motion. Boston Edison contends that its contract with Grant did not call for the "disposal" of PCBs and that it had no involvement in the crucial decision as to how the streetlights would be disposed of. *Id.* at 25 ("There is simply no evidence to suggest that Boston Edison anticipated (or even should have anticipated) that someone would shred capacitors" thereby releasing PCBs on plaintiffs' property); *Id.* at 29 ("The undisputed facts demonstrate that Boston Edison did not 'make the decision' to send capacitors to the Branch companies' ... facility, nor did it have knowledge that the streetlight capacitors were destined for that facility."). Boston Edison's first argument essentially revisits its contention that it never *intended* to arrange for the disposal of hazardous waste. As to the second argument, while other courts have employed the "crucial decision" test with respect to CERCLA claims, *see United States v. A & F Materials Co., Inc.,* 582 F.Supp. 842 (S.D.Ill.1984); *Chatham Steel Corp.,* 858 F.Supp. at 1144, this Court in *Violet v. Picillo,* rejected the argument that "because [the defendant] did not select the site at which its wastes were discovered," it was not liable under CERCLA. 648 F.Supp. at 1290. This Court specifically stated that CERCLA "does not require that the arrangement [for disposal of hazardous wastes] include knowledge of the ultimate disposal site." *Id.* at 1291 (citing *United States v. Ward,* 618 F.Supp. 884, 895 (E.D.N.C.

Even if liability under CERCLA requires a showing of intent to dispose of hazardous substances, plaintiffs have submitted evidence which creates a genuine issue of material fact regarding Boston Edison's intent. First, based upon the knowledge of Boston Edison's senior environmental engineer, plaintiffs allege that Boston Edison knew that its streetlights contained PCB capacitors.[42] Second, plaintiffs allege that Boston Edison sought to sell its scrap metals which included streetlights containing PCBs. To effectuate this goal, Boston Edison prepared Requests for Quotations that specifically contemplated the disposal of the scrap materials.[43] The RFQs provided that the "Scope of Work" involved "the sale/disposal of all Scrap Metals from our facilities at various locations in the Greater Boston area." The RFQs further provided that the "sale/disposal" agreement would be a two year agreement with an option to extend for a third year to the successful bidder. Although Boston Edison argues that the term, "sale/disposal" "had become somewhat standardized language found in whatever scrap transaction at hand,"[44] it is clear that *a material issue of fact exists as to Boston Edison's intent to dispose of hazardous wastes.* In an adden-

dum to its scrap sales contract, Boston Edison informed scrap metal dealers to obtain all necessary permits and licenses, and to conform to all applicable federal and state laws, "in connection with its handling, use, transportation, storage, and disposal" of the scrap.[45] Moreover, in an internal memorandum, Boston Edison referred to Grant as its "scrap disposal contractor."[46] Thus, even if plaintiffs were required to show that Boston Edison intended to dispose of the hazardous materials, Boston Edison's motion for summary judgment should be denied because plaintiffs have submitted evidence which creates a genuine issue of material fact regarding Boston Edison's intent.[47]

### 3. Pendent State Law Claims

 Plaintiffs have also asserted state law claims of trespass and nuisance against defendants, Boston Edison and Grant. In their response to Boston Edison's motion for summary judgment, plaintiffs have not opposed, either factually or legally, Boston Edison's request for summary judgment on the state law claims. It should also be noted that, at a hearing held on this matter on January 5, 1995, plaintiffs' counsel did not

---

1985)). It remains that Boston Edison made the decision to dispose of the streetlights containing PCBs by selling them to Grant.

**42.** Stone Deposition (Exhibit 5 from Grant's submissions) at 38 ("From what I know about PCBs and how they were manufactured, yeah, I think it would be kind of general knowledge that the capacitors contain PCBs."). *See also* Stone Aff. at ¶¶ 4, 5 (from Boston Edison's submissions) ("Streetlights are among the types of lighting fixtures that frequently are fitted with capacitors or ballasts. I have become generally familiar with the kinds of capacitors or ballasts that typically are found in streetlights of the variety that Boston Edison has and has had on its system. It is my experience that capacitors or ballasts fitted on these streetlights typically qualify as 'small capacitors' within the meaning of the PCB regulations. . . . I have never seen or heard of a Boston Electric streetlight being fitted with a capacitor or ballast that was too large to qualify as a 'small capacitor' within the meaning of the PCB regulations."); Stone Deposition at 39 (". . . small capacitors do contain PCBs, can contain PCBs.").

**43.** Both RFQ # 51415 and RFQ # 51730 contemplated "the sale/*disposal* of all scrap metals." (emphasis added).

**44.** Poindexter Aff. at ¶ 15.

**45.** Poindexter Aff. at Exhibit D (from Boston Edison's submissions).

**46.** Boston Edison Company Office Memorandum of May 13, 1991 (Exhibit 29 from Grant's submissions).

**47.** At a hearing held on January 5, 1995, counsel for Boston Edison argued that it could have legally disposed of its streetlights containing PCBs in a chemical waste landfill pursuant to 40 CFR § 761.60(a)(2)(ii). Although the federal regulations state that "PCB–Contaminated Electrical Equipment containing a PCB concentration of 50 ppm or greater, but less than 500 ppm" may be disposed of in a chemical waste landfill, plaintiffs' counsel correctly argues that Boston Edison did not comply with these regulations in this instance. In fact, rather than disposing the streetlights at a waste site, Boston Edison made the decision to sell them to Grant, a scrap metal vendor, who then allegedly re-sold Boston Edison's streetlights containing PCBs to plaintiffs.

oppose my recommendation that the state law claims be dismissed as to both defendants Grant and Boston Edison. Thus, I recommend that summary judgment be granted for both defendants as to plaintiffs' claims of trespass and nuisance.

██ Defendant Grant has also filed cross-claims against Boston Edison for contribution and indemnification. The only state law claim on which summary judgment should be entered as to Grant is Grant's indemnification claim against defendant Boston Edison. Since I recommend that summary judgment be granted as to plaintiffs' claims of trespass and nuisance, it follows that Grant does not have a valid claim for indemnification based on plaintiffs' state law claims against Boston Edison. Additionally, Grant does not have a valid indemnification claim pursuant to CERCLA against Boston Edison. In *United States v. Cannons Eng'g. Corp.,* the First Circuit found that, where appellants allege no contractual basis for indemnification, no right of indemnification will be read into CERCLA.[48] The court also noted that the appellants' "noncontractual indemnity claim, by definition and extrapolation, 'is in effect only a more extreme form of [a claim for] contribution,'"[49] which is permissible under CERCLA.[50] Here, Grant has failed to show that Boston Edison agreed to indemnify Grant for any liabilities, including the potential liability that is presented by this action. Grant's indemnification claims are really disguised contribution claims, and

cannot be maintained. Accordingly, this Court should grant summary judgment for Boston Edison on Grant's cross-claim against Boston Edison for indemnification.

*Plaintiffs' Motion for Partial Summary Judgment Against Boston Edison*

In response to Boston Edison's motion for summary judgment, plaintiffs have moved for partial summary judgment against Boston Edison "on the issue of liability ... under CERCLA section 107(a)(3)."[51] Although this Court has stated that a defendant "may be held liable under CERCLA without proof of knowledge or intent,"[52] it remains that liability under Section 107(a)(3) requires proof of the following four basic elements: 1) that the defendants disposed of hazardous substances; 2) at a facility which contains, at the time of discovery, hazardous substances of the kind the defendants disposed; 3) there is a release or a threatened release of that or any hazardous substances; 4) which triggers the incurrence of response costs.[53] Boston Edison correctly argues that there are disputed material facts at issue with regards to all of these elements and that plaintiffs' motion for partial summary judgment should be denied.[54] Among the disputed facts presented by Boston Edison are whether Boston Edison's streetlights contained PCBs[55] and whether Boston Edison's streetlights were disposed of on plaintiffs' property at the time of discovery of the hazardous wastes.[56]

---

48. *United States v. Cannons Eng'g. Corp.,* 899 F.2d 79, 92 (1st Cir.1990) ("Although CERCLA is silent regarding indemnification, we refuse to read into the statute a right to indemnification....").

49. *Id.* (citing *Drake v. Raymark Industries, Inc.,* 772 F.2d 1007, 1011 n. 2 (1st Cir.1985)).

50. *Id.* at 92.

51. Memorandum in Objection to Boston Edison's Motion for Summary Judgment at 40.

52. *Violet v. Picillo,* 648 F.Supp. at 1289.

53. *Id.*

54. Boston Edison's Objection to the Plaintiff's Cross–Motion for Partial Summary Judgment at 6–7.

55. While plaintiffs allege that tests were conducted to determine the level of PCB concentration in the streetlight capacitors delivered by Grant, Boston Edison claims that "there is no direct admissible evidence that any Boston Edison streetlights sold to Grant and (allegedly) resold to the Branch companies contained PCBs, and even more there is no evidence about the vintage of the streetlights sold to Grant or even the probability that they contained PCBs rather than not." *Id.* at 6.

56. While plaintiffs allege that PCBs contained in Boston Edison's streetlights were released onto its property, Boston Edison alleges that "there is no competent, admissible evidence that any streetlights at the Branch site originated with Boston Edison." *Id.* at 4.

*Conclusion*

Because there are material issues of fact remaining in dispute between the parties, I recommend that Boston Edison's motion for summary judgment be denied as to plaintiffs' CERCLA claim and Grant's cross-claim for contribution. In addition, I recommend that plaintiffs' motion for partial summary judgment against Boston Edison be denied. However, I recommend that summary judgment be entered for both defendants as to plaintiffs' claims of trespass and nuisance and for Boston Edison as to Grant's cross-claim for indemnification.

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt.[57] Failure to file specific objections in a timely manner constitutes a waiver of the right to review by the district court.[58]

Jan. 6, 1995.

*Report and Recommendation*

BOUDEWYNS, United States Magistrate Judge.

The matter before the court is a review of third-party plaintiff's, Boston Edison Company ("Boston Edison"), motion for summary judgment with regards to the counter-claims of four, third-party defendants which have been brought into the case by Boston Edison. This matter has been referred to me for preliminary review, findings, and recommended disposition.[1] As discussed below, I recommend that defendant's, Boston Edison, motion for summary judgment be denied for the reasons indicated in my Report and Recommendation in this case of January 6, 1995. For the Court's ease of reference, I have reproduced in this report relevant portions of my January 1995 report. However, the Court should be aware that the first full paragraph on page 8 contains new matters for your information.

*Discussion*

This motion for summary judgment is made pursuant to FRCP 56(c), which states:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The initial burden in a summary judgment motion requires the moving party to show that no genuine issue exists as to any material fact.[2] The burden then shifts to the non-moving party to show that there is least one factual issue that is both "genuine" and "material." The factual issue is "genuine" if there is sufficient evidence favoring the non-moving party on which a jury could reasonably return a verdict for that party.[3] If the evidence is based on conjecture, merely colorable, or is not significantly probative of the facts alleged in the complaint, there is no "genuine" issue, and summary judgment may be granted.[4] "This evidence 'cannot be conjectural or problematic; it must have substance in that it limns differing versions of the truth which a fact finder must resolve at an ensuing trial.'"[5] The issue of fact is "material" if the dispute necessarily "affect[s]

**57.** Rule 32, Local Rules of Court; Fed.R.Civ.P. 72(b).

**58.** *United States v. Valencia–Copete,* 792 F.2d 4 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1st Cir.1980).

**1.** 28 U.S.C. § 636(b)(1)(B); *Mathews v. Weber,* 423 U.S. 261, 96 S.Ct. 549, 46 L.Ed.2d 483 (1976).

**2.** *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

**3.** *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). In a summary judgment motion, the Court will not resolve questions of credibility or conflicting inferences. Rather, it will assess the sufficiency of evidence as a matter of law, resolving all factual disputes in favor of the opponent. *Id.*

**4.** *Id.; First. Nat'l. Bank v. Cities Service Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968); *Local No. 48, United Brotherhood of Carpenters and Joiners v. United Brotherhood of Carpenters and Joiners,* 920 F.2d 1047, 1050 (1st Cir.1990).

**5.** *Mesnick v. General Elec. Co.,* 950 F.2d 816 (1st Cir.1991) (quoting *Mack v. Great Atl. & Pac. Tea Co.,* 871 F.2d 179, 181 (1st Cir.1989)).

the outcome of the suit." [6] The Court's function is to determine whether or not such a genuine issue exists, and not to resolve such existing factual issues.[7]

If the Court determines that no genuine issue of material fact exists, the Court must then determine whether the movant is entitled to judgment as a matter of law. In making this determination, the Court considers the facts from the record, and makes inferences therefrom in the light most favorable to the nonmoving party.[8]

*Boston Edison's Motion for Summary Judgment*

### 1. *Personal Jurisdiction* [9]

Boston Edison claims that its contacts with Rhode Island are insufficient to support this Court's assertion of personal jurisdiction over it. The burden of establishing personal jurisdiction rests with the plaintiff.[10] This Court has frequently addressed what must be shown in order for the Court to exercise personal jurisdiction over a non-resident defendant.[11] The Rhode Island long-arm statute [12] extends to the full reach of the due process clause [13] and explicitly authorizes the judicial exercise of jurisdiction to the extent that such jurisdiction does not violate the Constitution. Since a finding of constitutionally permissible jurisdiction implies compliance with the Rhode Island long-arm statute, this Court need consider only whether the exercise of jurisdiction over the defendants satisfies the due process clause of the Fourteenth Amendment.

In a long line of cases, the United States Supreme Court has sought to define the Fourteenth Amendment boundaries of personal jurisdiction. The basic standard announced by the Supreme Court is as follows:

> [D]ue process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional" notions of "fair play and substantial justice." [14]

Further, the sufficiency of minimal contacts to support an exercise of jurisdiction cannot be determined by any set formula or rule of

---

**6.** *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

**7.** *Id.* at 249, 106 S.Ct. at 2510.

**8.** *Anderson,* 477 U.S. at 248, 255, 106 S.Ct. at 2510, 2513. *See Blanchard v. Peerless Ins. Co.,* 958 F.2d 483, 485 (1st Cir.1992); *Continental Casualty Co. v. Canadian Universal Ins. Co.,* 924 F.2d 370, 373 (1st Cir.1991).

**9.** Defendant, Boston Edison, preserved its personal jurisdiction objection in its responsive pleading. Although some courts have entered summary judgment on jurisdictional grounds, other courts have ruled that summary judgment is an inappropriate vehicle for contesting personal jurisdiction over the parties. *See* 10 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2713 (1983). The matter is rather straight-forward in this case and need not be dealt with in a separate motion.

**10.** *Donatelli v. National Hockey League,* 893 F.2d 459 (1st Cir.1990)

**11.** *Thompson Trading Ltd. v. Allied Lyons PLC,* 123 F.R.D. 417 (D.R.I.1989); *Levinger v. Matthew Stuart & Co.,* 676 F.Supp. 437 (D.R.I.1988). In *Levinger* the Court noted:

> Whether a federal court has personal jurisdiction over a defendant depends upon two criteria: (1) whether the mandates of the forum state's long-arm statute have been satisfied, and (2) whether the defendant has been hailed into the particular court in accordance with the due process clause of the Fourteenth Amendment to the United States Constitution. Since the Supreme Court of Rhode Island has held that Rhode Island's long-arm statute reaches to the full breadth of the Fourteenth Amendment ... one need only examine the foundation for the second criterion listed above ... (citations omitted).

676 F.Supp. at 439.

**12.** The Rhode Island long-arm statute provides:

> Every foreign corporation, every individual not a resident of this state ... and every partnership or association, composed of any person or persons, not such residents, that shall have the necessary minimum contacts with the state of Rhode Island, shall be subject to the jurisdiction of the state of Rhode Island ... in every case not contrary to the provisions of the constitution or laws of the United States.

R.I.G.L. § 9–5–33(a) (1985).

**13.** *Conn v. ITT Aetna Finance Co.,* 105 R.I. 397, 402, 252 A.2d 184, 186 (1969).

**14.** *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940)).

thumb, but must rest on a consideration of what is fair and reasonable in the circumstances of each particular case.[15] Whether due process is satisfied depends upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to ensure.[16]

Two doctrines relating to personal jurisdiction have emerged in recent decisions. These two doctrines provide a helpful framework for analysis of this case. First, general personal jurisdiction is said to exist where a defendant has such continuous and systematic contacts with the forum that bringing him into court on any matter, whether arising out of those contacts or not, does not offend the *International Shoe* due process standard.[17] The second doctrine, that of specific personal jurisdiction, is said to exist if the claim for relief sued upon arises out of or relates to a defendant's contacts with the forum state.[18] If so, then specific personal jurisdiction may be found based on the relationship among the defendant, the forum, and the litigation.[19] This is a case where specific, not general, jurisdiction applies, since the claims brought by plaintiffs directly relate to Boston Edison's and Grant's contacts with Rhode Island.

A court may assert specific jurisdiction when the claims "arise out of" or are "directly related to" the defendant's contacts with the forum state.[20] Where, as here, a defendant injects dangerous toxic substances into the stream of commerce through an intermediary and places no geographical limitation on its destinations, the defendant is subject to specific jurisdiction in the state where the toxic substance comes to be located.[21] In addition, this Court has recognized that "Rhode Island has an extraordinary strong sovereign interest in providing a forum for action concerning injury to land within its borders." [22]

In the present case, it is undisputed that PCBs are hazardous. In the mid–1970s, Congress enacted the Toxic Substances Control Act in response to concerns about PCBs' harmfulness to human health and the environment.[23] As it was required to under the Act, the Environmental Protection Agency issued PCB regulations.[24] Boston Edison should have known that it was dispatching hazardous waste, PCBs in this instance, into a stream of commerce broad enough to include any and all states. Boston Edison requested bids from scrap metal vendors in order to sell its scrap metals. Boston Edison did not place any restrictions on the destination of its streetlights or its scrap metal when it accepted Grant's bid. More importantly, Boston Edison did not restrict Grant from selling the streetlights containing PCBs to plaintiffs, all of whom are Rhode Island corporations.[25] Thus, in accordance with *Picillo*, this Court has jurisdiction over Boston Edison where Boston Edison dispatched into the stream of commerce hazardous sub-

**15.** *Sandstrom v. ChemLawn Corp.,* 904 F.2d 83 (1st Cir.1990).

**16.** *International Shoe Co.,* 326 U.S. at 319, 66 S.Ct. at 159.

**17.** *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984); *Glater v. Eli Lilly & Co.,* 744 F.2d 213, 215 (1st Cir.1984).

**18.** *Id.*

**19.** *Id.*

**20.** *See Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Glater v. Eli Lilly & Co.,* 744 F.2d 213 (1st Cir.1984).

**21.** *Violet v. Picillo,* 613 F.Supp. 1563, 1577 (D.R.I.1985) ("Rather, these defendants dispatched into that stream [of commerce] volatile and dangerous toxic substances—and did so without determining where these substances would come to rest. As other courts have recognized, and as common sense suggests, where a defendant deals in such inherently dangerous products, a lesser showing than is ordinarily required will support jurisdiction.").

**22.** *Violet v. Picillo,* 613 F.Supp. at 1579.

**23.** Memorandum in Support of the Motion for Summary Judgment at 9.

**24.** *Id.* at 10.

**25.** Jamieson Aff. at ¶ 10 (Exhibit 1 from Grant's submissions) ("Boston Edison never placed any restrictions on the destination of the scrap, including the streetlights."); Poindexter Dep. at 64 (Exhibit 11 from Grant's submissions).

stances without restricting in any way the destination of these substances.

Boston Edison cites to a very recent case,[26] as support for its renewed claim that this Court lacks *in personam* jurisdiction over it. The reasoning of that case clearly supports Boston Edison's position. The *Crown Cork* court specifically considered the reasoning of *Violet v. Picillo* and rejected it.[27] The *Crown Cork* court found that the broad holding of *Picillo* allowed "minimum contacts" to essentially equal a "no contact" reading of CERCLA jurisdiction which violates the constitutional limits of minimum contacts as defined by the Supreme Court. However, *Picillo* is still the law in this Circuit, I believe it should be adhered to.

### 2. CERCLA Claim

Boston Edison argues that it should be granted summary judgment because the third-party defendants cannot establish essential elements of their counter-claim pursuant to the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. § 9601 *et. seq.* ("CERCLA"). The applicable section defining Boston Edison's potential liability for purposes of the CERCLA statute is Section 107(a)(3). This section states in relevant part:

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or operated by another party or entity and containing such hazardous substances ...

(4) ... from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable ... [28]

Boston Edison argues that "[g]iven the plain statutory language requiring that the defendant have 'arranged for' disposal of hazardous substances, the critical question underlying section 107(a)(3) liability is ... whether the defendant *intended* the transaction to serve as a means to dispose of hazardous substances."[29] While courts have supported Boston Edison's argument,[30] this Court has adopted the view that Congress created a strict liability scheme when it enacted Section 107(a)(3) of CERCLA.[31] "Thus, if the plaintiff is able to prove at trial the statutory elements of Section 107(a)(3), [the defendant] may be held liable *without proof of knowledge or intent.*"[32]

Boston Edison, however, maintains that it is not liable under CERCLA because it never *intended* to dispose of hazardous substances through its scrap metal sales to Grant.[33]

**26.** *Crown Cork and Seal Company, Inc. v. Dockery*, 886 F.Supp. 1253 (M.D.N.C.1995).

**27.** 886 F.Supp. at 1259 n. 4.

**28.** 42 U.S.C. § 9607(a)(3).

**29.** Memorandum in Support of Motion for Summary Judgment at 18.

**30.** *Amcast Industries Corp. v. Detrex Corp.* 2 F.3d 746 (7th Cir.1993); *United States v. Cello–Foil Prods., Inc.*, 848 F.Supp. 1352, 1357 (W.D.Mich. 1994).

**31.** *Violet v. Picillo*, 648 F.Supp. 1283, 1289 (D.R.I.1986), *overruled on other grounds by United States v. Davis*, 794 F.Supp. 67 (D.R.I.1992) ("the Court overrules that portion of *Picillo* which allows equitable defenses" against plaintiff's CERCLA claim). While counsel for Boston Edison argues that there are recent cases which disagree with *Picillo, see supra* at n. 38, it is equally clear that there are recent cases which agree with *Picillo. See United States v. Aceto Agric. Chems. Corp.*, 872 F.2d 1373, 1379–81 (8th Cir.1989); *Chatham Steel Corp. v. Brown*, 858

F.Supp. 1130 (N.D.Fla.1994); *United States v. Maryland Sand, Gravel and Stone Company*, No. HAR 89–2869, 1994 WL 541069 (D.Md.1994).

**32.** *Id.* (emphasis added). For the list of these statutory elements *see infra* at p. 921.

**33.** Memorandum of Law in Support of Motion for Summary Judgment at 15. Boston Edison also raises two additional arguments in support of its motion. Boston Edison contends that its contract with Grant did not call for the "disposal" of PCBs and that it had no involvement in the crucial decision as to how the streetlights would be disposed of. *Id.* at 25 ("There is simply no evidence to suggest that Boston Edison anticipated (or even should have anticipated) that someone would shred capacitors" thereby releasing PCBs on plaintiffs' property); *Id.* at 29 ("The undisputed facts demonstrate that Boston Edison did not 'make the decision' to send capacitors to the Branch companies' ... facility, nor did it have knowledge that the streetlight capacitors were destined for that facility."). Boston Edison's first argument essentially revisits its contention that it never *intended* to arrange for the

Even if liability under CERCLA requires a showing of intent to dispose of hazardous substances, plaintiffs have submitted evidence which creates a genuine issue of material fact regarding Boston Edison's intent. First, based upon the knowledge of Boston Edison's senior environmental engineer, plaintiffs allege that Boston Edison knew that its streetlights contained PCB capacitors.[34] Second, plaintiffs allege that Boston Edison sought to sell its scrap metals which included streetlights containing PCBs. To effectuate this goal, Boston Edison prepared Requests for Quotations that specifically contemplated the disposal of the scrap materials.[35] The RFQs provided that the "Scope of Work" involved "the sale/disposal of all Scrap Metals from our facilities at various locations in the Greater Boston area." The RFQs further provided that the "sale/disposal" agreement would be a two year agreement with an option to extend for a third year to the successful bidder. Although Boston Edison argues that the term, "sale/disposal"

"had become somewhat standardized language found in whatever scrap transaction at hand,"[36] it is clear that *a material issue of fact exists as to Boston Edison's intent to dispose of hazardous wastes.* In an addendum to its scrap sales contract, Boston Edison informed scrap metal dealers to obtain all necessary permits and licenses, and to conform to all applicable federal and state laws, "in connection with its handling, use, transportation, storage, and disposal" of the scrap.[37] Moreover, in an internal memorandum, Boston Edison referred to Grant as its "scrap disposal contractor."[38] Thus, even if plaintiffs were required to show that Boston Edison intended to dispose of the hazardous materials, Boston Edison's motion for summary judgment should be denied because plaintiffs have submitted evidence which creates a genuine issue of material fact regarding Boston Edison's intent.[39]

*Conclusion*

Because there are material issues of fact between the parties remaining in dispute, I

disposal of hazardous waste. As to the second argument, while other courts have employed the "crucial decision" test with respect to CERCLA claims, *see United States v. A & F Materials Co., Inc.*, 582 F.Supp. 842 (S.D.Ill.1984); *Chatham Steel Corp.*, 858 F.Supp. at 1144, this Court in *Violet v. Picillo*, rejected the argument that "because [the defendant] did not select the site at which its wastes were discovered," it was not liable under CERCLA. 648 F.Supp. at 1290. This Court specifically stated that CERCLA "does not require that the arrangement [for disposal of hazardous wastes] include knowledge of the ultimate disposal site." *Id.* at 1291 (citing *United States v. Ward*, 618 F.Supp. 884, 895 (E.D.N.C. 1985)). It remains that Boston Edison made the decision to dispose of the streetlights containing PCBs by selling them to Grant.

34. Stone Deposition (Exhibit 5 from Grant's submissions) at 38 ("From what I know about PCBs and how they were manufactured, yeah, I think it would be kind of general knowledge that the capacitors contain PCBs."). *See also* Stone Aff. at ¶¶ 4, 5 (from Boston Edison's submissions) ("Streetlights are among the types of lighting fixtures that frequently are fitted with capacitors or ballasts. I have become generally familiar with the kinds of capacitors or ballasts that typically are found in streetlights of the variety that Boston Edison has and has had on its system. It is my experience that capacitors or ballasts fitted on these streetlights typically qualify as 'small capacitors' within the meaning of the PCB regulations.... I have never seen or heard of a Boston Electric streetlight being fitted with a

capacitor or ballast that was too large to qualify as a 'small capacitor' within the meaning of the PCB regulations."); Stone Deposition at 39 ("... small capacitors do contain PCBs, can contain PCBs.").

35. Both RFQ # 51415 and RFQ # 51730 contemplated "the sale/*disposal* of all scrap metals." (emphasis added).

36. Poindexter Aff. at ¶ 15.

37. Poindexter Aff. at Exhibit D (from Boston Edison's submissions).

38. Boston Edison Company Office Memorandum of May 13, 1991 (Exhibit 29 from Grant's submissions).

39. At a hearing held on January 5, 1995, counsel for Boston Edison argued that it could have legally disposed of its streetlights containing PCBs in a chemical waste landfill pursuant to 40 CFR § 761.60(a)(2)(ii). Although the federal regulations state that "PCB–Contaminated Electrical Equipment containing a PCB concentration of 50 ppm or greater, but less than 500 ppm" may be disposed of in a chemical waste landfill, plaintiffs' counsel correctly argues that Boston Edison did not comply with these regulations in this instance. In fact, rather than disposing the streetlights at a waste site, Boston Edison made the decision to sell them to Grant, a scrap metal vendor, who then allegedly re-sold Boston Edison's streetlights containing PCBs to plaintiffs.

recommend that Boston Edison's motion for summary judgment be denied.

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt.[40] Failure to file specific objections in a timely manner constitutes a waiver of the right to review by the district court.[41]

April 25, 1996.

---

**40.** Rule 32, Local Rules of Court; Fed.R.Civ.P. 72(b).

**41.** *United States v. Valencia–Copete,* 792 F.2d 4 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1st Cir.1980).